**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **MICHAEL JETT,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )   **Case No. 3:17-CV-517-MAB** |
| | ) |
| **DEE DEE BROOKHART and** | ) |
| **ROB JEFFREYS**, | ) |
| | ) |
| **Defendants.** | ) |

<u>**MEMORANDUM AND ORDER**</u>

**BEATTY, Magistrate Judge:**

This matter is currently before the Court on the amended motion for summary judgment filed by Defendants Dee Dee Brookhart and Rob Jeffreys (Doc. 77). For the reasons explained below, Defendants' motion for summary judgment is granted in part and denied in part.

<u>**BACKGROUND**</u>

Plaintiff Michael Jett originally filed this action on May 16, 2017 pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act ("Rehab Act") for deprivations of his rights at Lawrence Correctional Center (Doc. 1). Given deficiencies in the complaint and Plaintiff's representation that he is severely dyslexic and unable to read or write, counsel was immediately recruited for him (Doc. 7). Counsel then filed an amended complaint on August 23, 2017, which remains the operative complaint in this matter (Doc. 12).

The amended complaint alleged that Plaintiff was denied access to programs, services, and activities at Lawrence because prison officials failed or refused to provide him with accommodations for his dyslexia (Doc. 12). More specifically, Plaintiff alleged that he needed but did not receive a qualified and appropriate ADA attendant and/or other auxiliary aids (such as text-to speech software or a dictation machine) to assist him with reading and writing. He also needed but did not receive reasonable accommodations while taking the Test of Adult Basic Education ("TABE"). He alleged that the inmate channel, which only provides information in a written format and not an auditory format, was inaccessible. Finally, he alleged that prison officials refused to transfer him to a different facility that could and would provide him with the accommodations that he needed.

According to Plaintiff, without accommodations, his access to legal and other written materials in the law library, during disciplinary hearings, classification reviews, medical appointments, and religious services was limited. His access to critical announcements from the prison regarding things such as counts, mealtimes, medical and legal call-outs, and recreation time, was limited. His communication with his family, friends, and attorneys was restricted. His access to the grievance process was restricted. His access to jobs was restricted. And his access to certain educational and vocational programs was restricted because they require a threshold score on the TABE, which Plaintiff was unable to achieve without reasonable accommodations that prison officials refused to provide him.

Following a threshold review of the complaint pursuant to 28 U.S.C. § 1915A,

Plaintiff was permitted to proceed on the following claims:

> **Count 1:** Failure to accommodate Plaintiff's dyslexia in violation of Title II of the Americans with Disabilities Act against the Director of the IDOC.[1] [2]

> **Count 2:** Failure to accommodate Plaintiff's dyslexia in violation of the Rehabilitation Act against the Director of the IDOC.

> **Count 5:** Fourteenth Amendment Equal Protection claim against Defendant Dee Dee Brookhart for denying Plaintiff access to educational and vocational programs without any rational basis for doing so.

(Doc. 17).

Defendants filed their motion for summary judgment on the merits of Plaintiff's claims and memorandum in support in June 2019 (Doc. 63), to which Plaintiff filed his response in opposition (Doc. 69). Defendants then realized that they had inadvertently filed an unfinished draft of their memorandum (Doc. 64). They were permitted to file an amended motion for summary judgment, which they did in December 2019 (Docs, 77, 78). Plaintiff filed a response in opposition (Doc. 82), along with a statement of additional,

---

[1] Defendant Rob Jeffreys is the current Director of the IDOC.

[2] The amended complaint pertains only to events and issues at Lawrence (*see* Doc. 12). However, in their summary judgment briefing, Defendants and Plaintiff present facts and arguments regarding accommodations provided not only at Lawrence, but also at Taylorville (where Plaintiff was transferred in December 2017), Pinckneyville (where Plaintiff was transferred in May 2018), and Big Muddy River (where Plaintiff was transferred in May 2019) (Docs. 78, 82, 82-1, 83, 86). (The IDOC's online inmate locator indicates that Plaintiff is currently incarcerated at Dixon.) Any claims that arose out of Plaintiff's time at Taylorville, Pinckneyville, or Big Muddy River are not properly before the Court. Plaintiff never sought to amend his complaint to expand the scope of this lawsuit by adding allegations regarding events at three additional facilities. And even if he had, it is questionable whether the Court would have permitted such an amendment. First, litigating claims involving four different facilities together in one lawsuit is potentially unwieldy. Second, any claim against Big Muddy did not arise until this case had already been pending for two years and discovery was about to close. Finally, there are no indications or assurances that any claim regarding Plaintiff's time at Taylorville, Pinckneyville, and Big Muddy River is fully exhausted. Consequently, the Court will consider *only* Plaintiff's claim pleaded in the amended complaint regarding his time at Lawrence.

undisputed material facts (Doc. 82-1). Defendants filed a reply in support of their motion for summary judgment (Doc. 83), and then at the direction of the Court, a response to Plaintiff's statement of additional facts (Doc. 86).

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, Michael Jett, is an inmate within the IDOC. All of the allegations in the complaint pertain to his time at Lawrence Correctional Center ("Lawrence") (Doc. 12), where he was housed from April 9, 2013 to December 13, 2017 (Doc. 78-3). Plaintiff testified that he was initially diagnosed with dyslexia by a school psychiatrist in first grade (Doc. 78-1, p. 19). As an adult, he was diagnosed again with severe dyslexia in 1999 by the Illinois Department of Human Services, after completing testing administered by the agency (Doc. 78-1, pp. 19, 20; *see also* Doc. 82-11).

Plaintiff testified that his dyslexia affects both his visual and auditory processing and he is unable to read and write (Doc. 78-1, pp. 20–22; Doc. 82, p. 2). He further testified that he attended grade school at a special school for students with learning disabilities (Doc. 78-1, pp. 9–10). He then attended Geneva High School, where everything was given to him on tape or verbally read to him, and he was allowed to give verbal answers (Doc. 78-1, p. 10; Doc. 82, p. 2). With the assistance, he was able to graduate in 1976, averaging grades from A to C (Doc. 78-1, p. 9; Doc. 82, p. 2). After finishing high school, Plaintiff attended college classes at Waubonsee Community College, but he is not sure he even earned any class credits (Doc. 78-1, p. 11; Doc. 82, p. 2).

As an adult, Plaintiff worked various jobs, including tool and die, press mill operation, and as a truck driver moving heavy equipment (Doc. 78-1, pp. 11–13; Doc. 82,

p. 2). During his first year at Lawrence, Plaintiff worked as an inmate porter for approximately six months (Doc. 78-1, p. 42; Doc. 82, p. 3). Defendants did not ask if any these jobs required Plaintiff to do any reading or writing (*see* Doc. 78-1). Defendants also point out that for the job moving heavy equipment, Plaintiff was required to and did obtain his CDL license (Doc. 78-1, p. 13, Doc. 82, pp. 2–3). But Defendants did not inquire as to whether he was provided any accommodations during the testing for the CDL license (*see* Doc. 78-1, p. 13).

Plaintiff testified that he needed assistance with reading and writing in prison in order to read "whatever is posted on the inmate TV channel," to read rules that are posted in the prison, to read books in the law library, to read mail, to write to family, to write grievances, and to take the Test of Adult Basic Education ("TABE") (Doc. 78-1, pp, 22, 23, 24, 29–50, 36, 43). The records submitted to the Court indicate that in July 2013, Plaintiff showed his counselor a letter from the Illinois Department of Human Services indicating that Plaintiff had severe dyslexia, and he requested an ADA attendant to assist him with personal and legal correspondence (Doc. 82-2, p. 19; *see* also Doc. 78-1, p. 7). An ADA attendant is a fellow inmate assigned to live in the same cell (*see* Doc. 78-1, p. 32; Doc. 82-6, pp. 32–33). Plaintiff again discussed "his issues regarding dyslexia and process for ADA assistance" with his counselor on September 4th (Doc. 82-2, p. 19). On March 18, 2014, Plaintiff followed up with his counselor on his request for an ADA attendant (*Id.* at p. 18). Plaintiff told his counselor that he talked to a social worker and also sent several requests to healthcare and to the ADA Coordinator (*Id.*). On April 4th, Plaintiff talked to Anne Tredway (who appears to have been the Assistant Warden and ADA coordinator

at Lawrence at that time) about his ADA request; Tredway noted that Plaintiff did not "have a permit for ADA will refer him to Dr. Coe to address his ADA needs" (*Id.*).

Five days later, on April 9, 2014, Dr. John Coe issued Plaintiff a medical permit (Doc. 78-7). On the permit, the box labeled "New Order" is check-marked (*Id.*). There is a section where "Medical" or "ADA" can be check-marked, and the "ADA" box was chosen (*Id.*). Then there is a list of items where the medical provider is supposed to indicate what type of permit is being issued, *e.g.*, a permit for a cane or a walker, a slow walk permit, *etc.* (*see id.*). Dr. Coe check-marked the box labeled "Other ADA," next to which he wrote "Attendant to help with reading and writing" (*Id.*). The permit was effective immediately and the expiration date was listed as "indefinite" (*Id.*).

It is clear that multiple ADA attendants were assigned to help Plaintiff with reading and writing at Lawrence (Doc. 78-1, pp. 27–28; *see also* Doc. 82-2, pp. 8, 9, 13, 16 (noting instances where Plaintiff asked for new attendant). Plaintiff testified that he had three different attendants at Lawrence (Doc. 78-1, pp. 27–28). However, there is no evidence regarding the time frame each attendant was assigned to him or the total amount of time Plaintiff had an ADA attendant (*see* Docs. 78, 82, 82-1, 83, 86). They all asked to be removed from the position or Plaintiff asked to have them removed (*Id.* at pp. 27–30; Doc. 78-3). Plaintiff testified that none of them realized "there was [going to be] so much reading and writing involved with me," they all had "a tough time" reading and writing, and they felt they were not qualified to be his ADA attendant (Doc. 78-1, pp. 29–30). He also claimed all three of his attendants at Lawrence "mentally, verbally, physically abuse[d him]" and "tr[ied] to extract money from [him] for commissary" (*Id.* at p. 31).

Despite Dr. Coe's indication that the permit was "indefinite," Defendants contend that "medical permits are only permitted to last for a period of one year before the inmate must be seen again to determine if the permit is still necessary" and Plaintiff's permit was never renewed (Doc. 78, p. 3; Doc. 78-3, pp. 1–2). It appears that Plaintiff's ADA attendant was taken away some time after April 1, 2016 (*see* Doc. 82-2, p. 8 (notes from April 14, 2016 and May 2, 2016)). By that time, Dee Dee Brookhart was the Assistant Warden of Programs and the ADA Coordinator at Lawrence (Doc. 82-6, p. 5). The cumulative counseling summary indicates that Plaintiff asked Deanna Brookhart on May 2nd "why his ADA attendant was removed" and Brookhart told him that "Per IDOC Legal we do not assign ADA attendants due to learning disabilities." (Doc. 82-2, p. 8; *see id.* p. 7). Plaintiff testified that Dr. Coe "pull[ed] it back" but then corrected himself and said "[i]t was Warden Tredway. . . . Warden Tredway wanted it pulled back, and then she turned around and reissued it—or they reissued it." (Doc. 78-1, p. 27).

The records indicate that another medical permit was issued to Plaintiff on December 21, 2016 (Doc. 82-3). The box labeled "Other ADA" was check-marked and next to it was written "attendant to read and write for Inmate Jett" (*Id.*). The permit was effective immediately and the expiration date was listed as "indef" (*Id.*), which the Court presumes to mean "indefinite." There is no evidence as to whether another attendant was assigned to Plaintiff after this permit was issued (*see* Docs. 78, 82, 86).[3]

---

[3] Plaintiff alleges in the complaint that as of August 23, 2017, no ADA attendant had been assigned to him despite his renewed medical permit for an attendant (Doc. 12, p. 9).

Defendants contend there are a variety of ways that an inmate who is unable to read or write can receive help that do not require an ADA attendant to live in their cell (Doc. 78-3). For example, the inmate can go to the dayroom and ask another offender for assistance, ask his counselor to read something to him, and/or visit the law library and ask a law clerk to read or write something for him (Doc. 78-3). However, Plaintiff testified that asking a counselor to read attorney/client privileged documentation in a case against the IDOC is not an option (Doc. 78-1, pp. 34–35). He further testified that the law clerks at the law library refuse to help him because it is a "self-help center" (Doc. 78-1, pp. 35–36, 40). And when asked "Have you found that other people are willing to help you write these grievances?", Plaintiff responded, "Not very many people are willing to help me." (Doc. 78-1, p. 38). He claimed there was "maybe a handful. Maybe five" inmates across all of the institutions he was housed at who helped him write grievances (Doc. 78-1, pp. 39–40).

Despite Plaintiff's testimony that he was unable to use the law library without an ADA attendant (Doc. 78-1, pp. ), the records demonstrate that he nevertheless went to the law library 89 times (an average of three to four times per month) during a two year stretch from December 2015 to December 2017 (Doc. 78-3; Doc. 78-8). Additionally, while Plaintiff testified that he went for stretches with no ADA attendant at Lawrence and had trouble finding other people to write for him, the records demonstrate that he submitted well over 100 grievances at the Lawrence and sent 151 to the ARB in the span of approximately four years (*see* Doc. 78-2; Doc. 82-2). In fact, he submitted so many grievance at Lawrence, prison officials talked to him on a number of occasions about his

misuse and abuse of the grievance process (Doc. 82-2, pp. 5, 6). He also submitted dozens upon dozens of written requests at Lawrence for various things (*see* Doc. 82-2).

As it pertains to the TABE, the evidence is murky as to whether Plaintiff was required to take the test, when he took it, what his score was, and the consequences of not achieving a higher score. Defendant Brookhart asserts that Plaintiff was not required to take the TABE due to the fact that he already had a high school diploma and completed some college classes (Doc. 78, p. 4; Doc. 78-3). However, Plaintiff denied that was true and submitted an Administrative Directive that provides inmates "shall" take a standardized academic achievement test—which is presumably the TABE—when they arrive at a facility in order to determine their academic achievement level (Doc. 82-10, p. 3). *See also* 20 ILL. ADMIN. CODE § 405.50. The directive further provides, however, that if the offender scores below a 6.0 grade level, they must attend a minimum of 90 instructional days in an Adult Basic Education program for reading and mathematics, *unless they are exempted* (Doc. 82-10, p. 3) (emphasis added). *See also* 20 ILL. ADMIN. CODE § 405.50. The cumulative counseling summary indicates that Plaintiff received such an exemption at Lawrence (Doc. 82-2, pp. 13, 14, 18; *see also* Doc. 78-1, p. 41).

Plaintiff testified that he never took the TABE test at Lawrence (Doc. 78-1, p. 41). But Plaintiff's attorney and defense counsel both assert that he *did* take the TABE at Lawrence in 2013 (Doc. 78, p. 4; Doc. 82, p. 6; Doc. 82-1, p. 5). They do not, however, agree on his score. Defendants claims he scored a 4.4 (Doc. 78, p. 4; Doc. 78-3; *see also* Doc. 78-4), while his attorney says he scored a 1.0 (Doc. 82, p. 6; Doc. 82-1, p. 5). A note in the cumulative counseling summary from July 9, 2013 indicates that Plaintiff's TABE score

was 1.0, but it does not indicate when or where Plaintiff took the test (Doc. 82-2, p. 19). Neither party produced any actual testing or academic records from Lawrence regarding Plaintiff's TABE score (*see* Docs. 78, 82, 82-1, 83, 86).

According to Plaintiff, he suffered negative effects from not being able to retake the TABE with adequate accommodations (Doc. 78-1, p. 12). He claimed his low TABE score meant that he could not enroll in vocational or college classes (*Id.*). His assertion is corroborated to an extent by a note in the cumulative counseling summary from an associate dean at Lakeland College (Doc. 82-2, p. 15). The note explains in order for an inmate to enroll in college programs offered at Lawrence through Lakeland College, the inmate must achieve "the minimum TABE score for the particular college program (*Id.*).[4] However, that same note also states that an inmate would be referred to take the TABE *if* all other requirements were met, including proof of a high school diploma or GED, there was a space open in the program, and there was no waiting list (*Id.*). In other words, if a minimum TABE score was the only thing standing in the way of an inmate being able to enroll in college, then he would be referred to take the test (*Id.*). The note goes on to state that there was no space in any of the programs and Plaintiff would have to be placed on a waitlist, and therefore the dean was not going to refer him to retake the TABE test (*Id.*). A different note in the cumulative counseling summary indicates that vocational classes at the institution were limited and there was a very lengthy wait list (Doc. 82-1, p. 5). Plaintiff was told that when he is enrolled in the class, he would be provided an ADA

---

[4] The parties did not submit any evidence as to what a minimum TABE score might be, but presumably it is something higher than a 1.0 or a 4.4.

attendant (*Id.*). Dee Dee Brookhart testified that she does not make decisions regarding an inmate's placement into education programs (Doc. 78-3, p. 3).

Plaintiff also testified in a conclusory fashion that his low TABE score prevented him from getting "a good-paying job" (Doc. 78-1, p. 45). Just prior to that testimony, however, he testified that his TABE score did not hold him back from any jobs and a woman named Ms. Woods had told him, "Mr. Jett, we're just going to waive the TABE test for you, and you can get any job in the house." (*Id.* at p. 41). Furthermore, the administrative directive that he submitted appears to contradict his assertion (Doc. 82-10, p. 4). The directive indicates that if the warden exempts an inmate from the adult basic education requirements then their job pay is not restricted (Doc. 82-10, p. 4), and the cumulative counseling summary indicates that Plaintiff received such an exemption at Lawrence (Doc. 82-2, pp. 13, 14, 18; *see also* Doc. 78-1, p. 41). The cumulative counseling summary demonstrates that Plaintiff applied for a multitude of jobs at Lawrence, including as a porter and for positions in the commissary, print shop, clothing, laundry, inside grounds (Doc. 82-2). Dee Dee Brookhart testified that she does not make decisions regarding an inmate's placement into work programs (Doc. 78-3, p. 3).

## DISCUSSION

Summary judgment is proper when the moving party "shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's

outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted). In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, and the court may not "choose between competing inferences or balance the relative weight of conflicting evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014)(citations omitted); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). Instead, "it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen*, 763 F.3d at 836.

## I.   Defendants' Admissions

In April 2018, Plaintiff served Defendants with requests for admission asking Defendants to admit the following pertinent things:

- Michael Jett has been diagnosed with dyslexia by the IDOC.
- Michael Jett is dyslexic to an extent that qualifies him as an "individual with a disability" pursuant to the Americans with Disabilities Act.
- A reasonable accommodation for a person with dyslexia is an attendant to assist with reading and writing, a Dictaphone, an audio TABE Test, and an audio calculator.
- Michael Jett is entitled to receive an attendant to read and write for him under the ADA.

(Doc. 41; Doc. 82-4, p. 9).

Defendants did not respond to the requests for admission within thirty days as required by Rule 36(a)(3) (Doc. 39; Doc. 40; Doc. 86, pp. 2–3). FED. R. CIV. P. 36(a)(3). Their failure to respond is deemed an admission. FED. R. CIV. P. 36(a)(3); *see also, e.g., Fabriko Acquisition Corp. v. Prokos*, 536 F.3d 605, 607 (7th Cir. 2008). In July 2018, Defendants

sought to withdraw their admissions (Docs. 39–41), but their request was summarily denied by Magistrate Judge Donald Wilkerson (Doc. 43). Consequently, under Rule 36(b), the matters in the requests to admit are conclusively established. FED. R. CIV. P. 36(b) ("A matter admitted under this rule is conclusively established, unless the court, on motion, permits the admission to be withdrawn or amended.").

## II.   ADA/REHAB ACT CLAIMS (Counts 1 and 2)

Both the ADA and the Rehab Act prohibit discrimination against the disabled. *CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014); 42 U.S.C. §12132; 29 U.S.C. § 794(a). Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehab Act similarly provides "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity." 29 U.S.C. § 794(a). Because the two statutes, as well as the federal regulations implementing them, are "materially identical," they are interpreted and applied in a consistent manner. *A.H. by Holzmueller v. Illinois High Sch. Ass'n*, 881 F.3d 587, 592 (7th Cir. 2018) (citing *Steimel v. Wernert*, 823 F.3d 902, 909 (7th Cir. 2016)).[5] For

---

[5] The only notable difference is that the Rehab Act includes as an additional requirement the receipt of federal funds, but this element is incontrovertible because all states accept it for their prisons. *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015); *Jaros v. Illinois Dep't of Corr.*, 685 F.3d 667, 671–72 (7th Cir. 2012).

the sake of ease, the Court refers only to the ADA throughout the course of the analysis.

To succeed on his claim of disability discrimination, Plaintiff must prove three basic elements: (1) he was a qualified individual with a disability; (2) he was excluded from or denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination; and (3) the exclusion, denial of benefits, or discrimination was because of his disability. *E.g., Lacy v. Cook Cty., Illinois*, 897 F.3d 847, 853 (7th Cir. 2018) (citation omitted). In order to receive compensatory damages, Plaintiff must also show deliberate indifference, meaning defendants "*knew* that harm to a federally protected right was substantially likely and . . . *failed* to act on that likelihood." *Hildreth v. Butler*, 960 F.3d 420, 431 (7th Cir. 2020) (quoting *Lacy*, 897 F.3d at 862).

It is well-established that the IDOC is a public entity within the meaning of the ADA and has always been subject to the nondiscrimination and accessibility requirements of Title II and the Rehab Act. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (per curiam). And Defendants do not dispute that the things at issue—*e.g.*, the law library, the grievance process, the TABE, written communication with family and friends, and institutional announcements—constitute "service[s], program[s], or activit[ies]" within the meaning of the ADA (*see* Doc. 85). 28 C.F.R. § 35.102(a) (The ADA applies to "all services, programs, and activities provided or made available by public entities."); 28 C.F.R. § Pt. 35, App. B (2011) ("[T]itle II applies to anything a public entity does."). Rather, they argue that Plaintiff's ADA/Rehab Act claims must fail because he was not disabled, or in the event that he *was* disabled, he was provided reasonable accommodations (Docs. 78, 83).

### A. "Disabled" as Defined by ADA

Defendants argue that Plaintiff's dyslexia does not constitute a disability under the ADA (Doc. 78, pp. 9–10). Specifically, Defendants contend that Plaintiff's accomplishments prior to incarceration and his ability to obtain and complete jobs while incarcerated show that his major life activities were not substantially limited by his dyslexia (*Id.*). The Court disagrees.

The ADA defines "disability" as "A) a physical or mental impairment that substantially limits one or more major life activities of [an] individual; B) a record of such an impairment; or C) being regarded as having such impairment." 42 U.S.C. § 12102(1). The federal regulations interpreting the ADA indicate that a "specific learning disability" can constitute a mental impairment, and the regulations explicitly mention dyslexia as an example of a mental impairment. 28 C.F.R. § 35.108(b)(1)(ii), (b)(2). Major life activities include reading, writing, learning, and communicating. *Id.* at § 35.108(c)(1)(i). And "[a]n impairment does not need to prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Id.* at § 35.108(d)(1)(v).

Here, there is evidence from which a reasonable jury could conclude that Plaintiff's dyslexia is a disability under subsection (A) or (B). Plaintiff has been clinically diagnosed with severe dyslexia (Doc. 82-10). He testified he is unable to read or write and he has received accommodations for his dyslexia throughout the course of his entire life. For example, he attended a special school for grade school, he received assistance with reading and writing in high school, and as an adult he received assistance through the

Illinois Department of Human Services (Doc. 78-1). The fact that he held jobs prior to and during his incarceration does not necessarily mean his dyslexia was not substantially limiting, especially when none of the jobs he held—construction, making tools and die, operating a press mill, moving heavy equipment, inmate porter, and kitchen worker— seem to involve much reading or writing, and Defendants did not provide any evidence to the contrary (*see* Docs. 78, 83, 86). Furthermore, as previously explained, Defendants admitted that Plaintiff's dyslexia constitutes a disability under the ADA. *See supra*, pp.11-12.

For these reasons, Defendants are not entitled to summary judgment on the issue of whether Plaintiff's dyslexia constituted an disability under the ADA and the Rehab Act.

### B. Failure to Reasonably Accommodate

Defendants next argue that even if Plaintiff was disabled, they provided him with reasonable accommodations for his disability (Doc. 78, pp. 10–14). Public entities are obligated to provide "reasonable modifications" for the disabled to ensure they have meaningful access to the benefits of the programs, services, and activities that such entities provide. 42 U.S.C. § 12182(b)(2)(A)(ii) ("[D]iscrimination includes . . . a failure to make reasonable modifications in policies, practices, or procedures . . . ."); 28 C.F.R. § 35.130(b)(7)(i) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.").

The regulations pertinent to this lawsuit provide that "[a] public entity shall take appropriate steps to ensure that communications with . . . participants . . . with disabilities are as effective as communications with others." 28 C.F.R § 35.160(a)(1). A public entity is required to "furnish appropriate auxiliary aids and services where necessary to afford" disabled individuals "an equal opportunity to participate in, and enjoy the benefits of" its services, programs, and activities. *Id.* at § 35.160(b)(1).

> The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

*Id.* at § 35.160(b)(2).

Ultimately, "[w]hether a requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties." *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002) (citation omitted). *See also* 1 AMERICANS WITH DISABILITIES: PRACTICE & COMPLIANCE MANUAL, § 2:88. In the prison context, whether accommodations are reasonable must be judged "in light of the overall institutional requirements," including "[s]ecurity concerns, safety concerns, and administrative exigencies." *Hildreth v. Butler*, 960 F.3d 420, 431 (7th Cir. 2020) (quoting *Love v. Westville Correctional Center*, 103 F.3d 558, 561 (7th Cir. 1996)). "[T]he three key elements of a reasonable accommodation [are] 'reasonable,' 'necessary,' and

'equal opportunity.'" *Oconomowoc Residential Programs*, 300 F.3d at 784. "An accommodation is reasonable if it is both efficacious and proportional to the costs to implement it." *Id.* (citation omitted). "An accommodation is unreasonable if it imposes undue financial or administrative burdens or requires a fundamental alteration in the nature of the program." *Id.* (citation omitted). "Whether the requested accommodation is necessary requires a 'showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability.'" *Id.* (citation omitted). In other words, the plaintiff must show that without the required accommodation he will be denied meaningful access to the services, programs, or activities. *Id.*

To begin with, making Plaintiff solicit gratuitous assistance from other inmates does not satisfy the prison's duty to accommodate Plaintiff's disability. *Cf.* 28 C.F.R § 35.160(c)(1), (2) (providing that a public entity cannot require a disabled individual to bring another individual with them to facilitate communication and cannot rely on an adult accompanying the disabled individual to facilitate communication except in an emergency or when all parties agree to it). Defendants also do not provide any explanation or legal authority as to how or why relying on his counselor for all of his reading and writing needs might constitute an acceptable accommodation under the ADA (*see* Docs. 78, 83, 86). As Plaintiff testified, there are obvious problems with relying on his counselors for help in reading and writing items related to legal action against the IDOC (Doc. 78-1, pp. 34–35).

With respect to the ADA attendant, Defendants admitted this was a reasonable

accommodation and Plaintiff was entitled to receive an attendant. There is evidence Plaintiff repeatedly asked for an attendant and nine months went by before he was referred to a doctor for the medical permit he needed in order to receive the accommodation. He received the necessary permit in April 2014, but it is unclear when an attendant was actually assigned to him; entries in the cumulative counseling summary suggest it took several more months (*see* Doc. 82-2, p. 17). Defendants did not offer any explanation for the delay (*see* Docs. 78, 83, 86). *See* 28 C.F.R § 35.160(b)(2) ("In order to be effective, auxiliary aids and services must be provided . . . in a timely manner . . . ."). Defendants admit there were other gaps in time when Plaintiff did not have an ADA attendant assigned to him (Doc. 86, p. 22; *see also* Doc. 82-2), although the precise lengths of these gaps is unknown. Plaintiff also testified that none of the ADA attendants that were assigned to him were qualified or properly trained to assist him with reading and writing. And by April 2016, Plaintiff's attendant was taken away and it appears that he was left without any accommodations whatsoever.

Defendants also admitted that a Dictaphone, an audio TABE Test, and an audio calculator were reasonable accommodations, but it is undisputed that none of these were provided to Plaintiff at Lawrence.

Furthermore, while the frequency of Plaintiff's visits to the law library and his prolific grievance-filing cast some doubt on whether accommodations were actually necessary to provide Plaintiff with meaningful access to the services, programs, or activities at issue, standing alone, it is not enough to entitle Defendant Jeffreys to summary judgment. To begin, Defendants admitted and it has been conclusively

established that, irrespective of Plaintiff's visits to the law library and the volume of grievances he submitted, an ADA attendant *was* a reasonable accommodation and Plaintiff was entitled to receive an attendant. Furthermore, the simple fact that Plaintiff went to the law library often and submitted a high volume of grievances does not necessarily mean that he was able to meaningfully access the law library and the grievance process. For example, Plaintiff testified that he could not read and when he went to the library, he looked at the books and did his best to decipher what they said (Doc. 78-1, pp. 49–50). So he might have gone to the library, but it remains in dispute whether he was able to gain any benefit from the books and materials available in the library. Plaintiff also testified he was unable to draft grievances alone without any assistance, and Defendants did not put forth any competent evidence to counter his testimony. Even assuming Plaintiff did write the grievances himself, there is no evidence that the content sufficiently communicated his issues to prison officials or that he was able to figure out what the responses said.

In sum, Defendants' admissions, the evidence in the record, as well as facts that are conspicuously missing from the record, collectively establish a material issue of fact as to whether Plaintiff was provided with reasonable accommodations at Lawrence and prevent summary judgment for Defendant Jeffreys on the merits of Plaintiff's ADA and Rehab Act claims.

### III.   EQUAL PROTECTION CLAIM (Count 5)

Plaintiff is proceeding in Count 5 on a claim that Defendant Dee Dee Brookhart violated the Fourteenth Amendment Equal Protection clause by denying him access to

educational and vocational programs without any rational basis for doing so (Doc. 12, Doc. 17). Considering Plaintiff's equal protection claim requires shifting gears mentally and thinking differently than the ADA claim required. The Fourteenth Amendment offers significantly less protection to disabled individuals than the ADA, and conduct that is illegal under the ADA might still be constitutionally permissible under the Fourteenth Amendment. *Stevens v. Illinois Dep't of Transp.*, 210 F.3d 732, 738 (7th Cir. 2000); *See also Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 372–73 (2001) (providing examples of ADA-imposed restrictions that far exceed those of the Fourteenth Amendment's Equal Protection Clause).

The Equal Protection Clause of the Fourteenth Amendment protects against government action that discriminates on the basis of membership in a protected class or infringes on a fundamental right, and it also protects against so-called "class-of-one" discrimination in which the government arbitrarily and irrationally singles out one person for discriminatory treatment. *E.g., Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010) (citations omitted). In an abundance of caution, Plaintiff was permitted to proceed on his Equal Protection claim against Brookhart under the theory that he was treated differently based on his membership in a class as well as the "class of one" theory (Doc. 17, p. 10).

For an equal-protection claim based on membership in this class, the relevant standard of review is rational basis review. *Garrett*, 531 U.S. at 367; *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 446 (1985); *Stevens*, 210 F.3d at 737–38. "Rational basis review requires the plaintiff to prove that (1) the state actor intentionally treated [him]

differently from others similarly situated; (2) this difference in treatment was caused by [his] membership in the class to which [he] belongs; and (3) this different treatment was not rationally related to a legitimate state interest." *Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 943 (7th Cir. 2009) (citing *Smith v. City of Chicago,* 457 F.3d 643, 650–51 (7th Cir. 2006)). Proceeding on a "class of one" equal protection claim means, "for practical purposes," that the plaintiff "need not demonstrate the second element of an equal protection challenge." *Srail*, 588 F.3d at 940. *See also Williamson v. Curran*, 714 F.3d 432, 449 (7th Cir. 2013) ("[A] class-of-one equal protection claim . . . at a minimum would require proof that the defendants intentionally treated [plaintiff] differently from others situated similarly to her for no rational reason.").[6]  That means for either type of equal protection claim, Plaintiff must prove that the disparate treatment he was subjected to was not rationally related to a legitimate state interest. "This deferential standard of review is a notoriously 'heavy legal lift for the challenger[ ].'" *Monarch Beverage Co. v. Cook*, 861 F.3d 678, 681 (7th Cir. 2017) (quoting *Indiana Petroleum Marketers & Convenience Store Ass'n v. Cook*, 808 F.3d 318, 322 (7th Cir. 2015). *Accord Srail*, 588 F.3d at 946 (rational basis "is an onerous test to overcome"); *Smith*, 457 F.3d at 652 (rational basis is "a lenient standard").

Under the rational basis standard, states may treat disabled individuals differently or refuse to make accommodations for them so long as "there is a rational relationship

---

[6] It remains unresolved in the Seventh Circuit whether the plaintiff in a "class of one" claim must also demonstrate that the discriminatory treatment was based on improper motive, hostile intent, or personal animus. *Chicago Studio Rental, Inc. v. Illinois Dep't of Commerce*, 940 F.3d 971, 979 (7th Cir. 2019) (citing *Del Marcelle v. Brown Cty. Corp.*, 680 F.3d 887(7th Cir. 2012). *See also Brunson v. Murray*, 843 F.3d 698, 706 (7th Cir. 2016) (explaining the doctrinal disagreement that occurred in *Del Marcelle* and remains unresolved).

between the disparity of treatment and some legitimate governmental purpose." *Discovery House, Inc. v. Consol. City of Indianapolis*, 319 F.3d 277, 282 (7th Cir. 2003) (citing *Garrett*, 531 U.S. at 367) ("States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational."). The state's actions have "a strong presumption of validity." *Indiana Petroleum Marketers*, 808 F.3d at 322 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993)). *Accord Stevens*, 210 F.3d at 738 ("[I]t is presumed that distinctions made by the State that are based on disability are rational and legitimate.") And "[t]he government need not have articulated a reason for the challenged action at the time the decision was made." *Smith*, 457 F.3d at 652 (citing *Garrett*, 531 U.S. at 367). It can "defend the rationality of its action on any ground it can muster . . . ." *Smith*, 457 F.3d at 652. The burden is on the plaintiff "to eliminate any reasonably conceivable state of facts that could provide a rational basis for the classification." *Srail,* 588 F.3d at 946 (quoting *Smith*, 457 F.3d at 652). *Accord Stevens*, 210 F.3d at 738 ("The burden rests on the individual to demonstrate that the government's claimed purpose is illegitimate or that the means used to achieve that purpose are irrational."). In other words, "[a]ll it takes to defeat the plaintiffs' claim is a *conceivable* rational basis for the difference in treatment." *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686–87 (7th Cir. 2013) (citing *Heller v. Doe,* 509 U.S. 312, 320 (1993); *see also Srail,* 588 F.3d at 946–47 ("[A]ny rational basis will suffice . . . .").

Here, the scope of Plaintiff's Equal Protection claim is limited: he alleges that his inability to participate in *educational and vocational programs* was a product of discrimination by Defendant Brookhart and her refusal to provide him with reasonable

accommodations for his dyslexia (Doc. 12, Doc. 17). According to Plaintiff, his ability to take college courses or vocational courses offered at Lawrence hinged on his TABE score (Doc. 12, pp. 7–8, 11–12; *see also, e.g.*, Doc. 82, p. 14). More specifically, he says he needed to earn an unspecified minimum TABE score in order to take college courses or vocational courses. In order to achieve that score, he needed to take the TABE with reasonable accommodations. But Defendant Brookhart refused to give him the opportunity to do so. Consequently, he says, he could not take any of the college or vocational courses. And he says, without those courses, he also could not get a higher paying prison job. Plaintiff further contends that while Defendant Brookhart refused to provide him with reasonable accommodations in order to access the educational or vocational programs, other disabled inmates who were, for example, blind or deaf, were given accommodations for their disabilities (Doc. 82, pp. 21–22; Doc. 82-1, p. 7; Doc. 82-6, pp. 15–16). In other words, individuals with learning disabilities were treated differently than individuals with physical disabilities.

However, Plaintiff's claims are simply not supported by any evidence in the record. There is nothing aside from Plaintiff's unadorned and unsupported assertions that his low TABE score precluded him from taking any educational or vocational classes (*see* Doc. 78-1, pp. 45, 46). Rather, the evidence shows that Plaintiff was exempted from taking the TABE and able to apply for whatever college courses and vocational programming he wanted (Doc. 78-1, p. 41; Doc. 78-3; Doc. 82-2, pp. 13, 14, 18). *See also* 20 ILL. ADMIN. CODE § 405.20 (providing offenders may be eligible to enroll in IDOC vocational education "regardless of test scores" and college vocational programs or

academic degree programs "if they have a verified GED certificate or high school diploma"). To the extent he was not able to get into any of the classes he applied for, the evidence in the record suggests only that it was due to high demand and lack of space in the programs, not his low TABE score. In fact, he was told that if he got off the waitlist at Lakeland College, he would be referred to retake the TABE if he did not meet the minimum score requirement. And Defendant Brookhart told Plaintiff that if he got off the waitlist and enrolled in the vocational programs at the facility, he would be provided an ADA attendant (Doc. 82-1, p. 5). Finally, despite Plaintiff's speculation that Defendant Brookhart determines which inmates attend classes (Doc. 78-1, p. 61), she testified that once an inmate applied for a class, it was not her decision whether or not he was accepted to participate in such programming (Doc. 78-3).

Simply put, Defendant Brookhart provided an explanation as to why Plaintiff was not administered the TABE with accommodations and why he was not able to take any college or educational courses. Plaintiff offered only his own conjecture to negate her justification or otherwise show that it was wholly impossible for her actions to relate to a legitimate government objective (*see* Doc. 82, pp. 21–22), which is, of course, insufficient to survive summary judgment. *Bass v. Joliet Pub. Sch.Dist. No. 86*, 746 F.3d 835, 841 (7th Cir. 2014) ("Speculation is no substitute for evidence at the summary judgment stage."); *Stephens v Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) (noting that "inferences relying on mere speculation or conjecture will not suffice"). *See also Fares Pawn, LLC v. Ind. Dep't of Fin. Insts.*, 755 F.3d 839, 845 (7th Cir. 2014) ("If [the court] can come up with a rational basis for the challenged action, that will be the end of the matter . . . ."). Defendant

Brookhart is therefore entitled to summary judgment on Plaintiff's Equal Protection claim. In light of this ruling, the Court need not reach Defendant Brookhart's argument that she was entitled to qualified immunity (*see* Doc. 78, pp. 15–16).

## CONCLUSION

The amended motion for summary judgment filed by Defendants Dee Dee Brookhart and Rob Jeffreys (Doc. 77) is **GRANTED in part and DENIED in part.** It is granted as to Plaintiff's equal protection claim against Defendant Brookhart (Count 5). Count 5 and Defendant Brookhart are **DISMISSED with prejudice** from this matter and judgment will be entered in her favor at the close of the case. Summary judgment is denied as to Plaintiff's claims under the ADA and the Rehabilitation Act (Counts 1 and 2). This matter will proceed to trial on these claims.

**IT IS SO ORDERED.**

**DATED: September 18, 2020**

**/s/ Mark A. Beatty**
**MARK A. BEATTY**
**United States Magistrate Judge**